LAW OFFICES OF MAUREEN GRAVES
Maureen R. Graves (Illinois Bar #6311493)
1326 East Madison Park
Chicago, IL 60615
Phone: 949-466-4248
Fax: 949-856-0168

Attorney for the Plaintiffs,
G.H., D.H., and R.H.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| G.H., Student, by his parents D.H. and R.H.; D.H., on her own behalf and as next friend of G.H.; and R.H., on his own behalf and as next friend of G.H.; | **Case No. 1:18-cv-5356** |
| Plaintiffs, | **COMPLAINT** |
| vs. | **20 U.S.C. § 1415(i)(3)** **29 U.S.C. § 794** **28 U.S.C. § 1367** **42 U.S.C. § 1983** **105 ILCS 10/1 et. seq.** |
| NEW TRIER HIGH SCHOOL DISTRICT #203; PAUL SALLY in his official capacity; ELLIE AMBUEHL, in her individual and official capacities; ILLINOIS STATE BOARD OF EDUCATION and TONY SMITH, Ph.D., in his official capacity, | |
| Defendants. | **JURY TRIAL DEMANDED as to Rehabilitation Act and Section 1983 Claims** |

NOW COME G.H., D.H. in her own capacity and as parent of G.H., R.H. in his own capacity and as parent of G.H., by and through their attorney, Maureen Graves, and state as follows:

## JURISDICTION AND VENUE

1.     This is a timely appeal of the Final Determination and Order ("Order") issued by

Impartial Mary Schwartz ("IHO") on April 7, 2018 after a seven and a half day special education

1

due process hearing held pursuant to the Individuals with Disabilities Educational Act of 2004 ("IDEA").

2.     This Court has jurisdiction over this matter pursuant to 105 ILCS Sec. 5/14-8.02(a)(i) and 20 U.S.C. Sec. 1415(i)(3). Venue is in this District because parties are located within the Northern District and all relevant events occurred within the Northern District of Illinois, Eastern Division.

**PARTIES**

3.     G.H. is a 17-year-old student who is about to be classified as a senior in high school. He qualifies for special education based on Other Health Impairment and Vision Impairment and is a person with a disability entitled to protections under Section 504 of the Rehabilitation Act of 1973. His disabilities are numerous, poorly understood and severe. He has severe motor impairments, which have been labelled "atypical cerebral palsy." He has great difficulty planning and executing deliberate movements, and experiences involuntary movements. He required years of therapy to learn to eat, and still requires assistance. He requires complete assistance with toileting. His vocal output consists of under 10 word approximations which familiar partners understand. He cannot manipulate a pen or pencil, or push buttons from an array of choices. He can touch items, but often imprecisely, and can exert enough pressure to move a switch. However, his timing is variable, which keeps him from using automatic scanning systems (in which he would pick a picture, word or letter as it goes by). He loves to walk, dance, swim, sled, listen to music, and socialize with peers, but requires assistance with all those activities. These profound impairments in G.H.'s ability to produce motor output have never been explained; mitochondrial disorders were considered, but not confirmed. G.H. also has cortical visual impairment—a kind of vision impairment that is based on brain rather than eye dysfunction. He

can see only things in an uncluttered setting, text has to be enlarged, and appropriate distances and angles are required. Enlarging text too much can be as detrimental as making it too small, because it is very hard to make sense of a few words on a page or scan large settings. Auditory descriptions are very helpful to him in understanding visual input. Most importantly, there is no indication that G.H.'s motoric impairments are accompanied by comparably significant—or any—cognitive or receptive language deficits. G.H. has had a great deal of specially designed instruction as well as living in a family committed to providing language and literacy opportunities. Though it is tempting and perhaps comforting to assume that a body as impaired as G.H.'s does not support an intellectually capable or psychosocially in many ways typical person, there is no basis for assuming that. Evidence is to the contrary: with adequate supports, G.H. has been able to show comprehension and to express ideas and feelings, albeit laboriously.

4.      D.H., G.H.'s mother, is a lawyer who has developed a specialty in special education advocacy on behalf of students with disabilities. She understands how processes are supposed to work, and tries to make that happen.. Even so, she cannot control how, when or if the District provides G.H. with an offer of a free and appropriate public education, or how it responds to parent advocacy.

5.      G.H.'s father, R.H., has helped pay for the many services that the family has obtained privately, and shares in G.H.'s complex care as well as providing recreational opportunities.

6.      G.H. lives in the New Trier High School District #203 (hereafter "New Trier" or "the District"), where he has been enrolled since the summer before his freshman year (summer 2015).

7.      Defendant New Trier High School District #203 is a governmental agency organized and existing under the laws of the State of Illinois and is located within Cook County. Defendant

is required by federal and Illinois law to provide students such as Plaintiff G.H. with a free appropriate educational program. Defendant is a "local educational agency" within the meaning of 20 U.S.C. § 1401(15) and a recipient of federal funds subject to Section 504 of the Rehabilitation Act of 1973. Defendant hires staff who are aware of their obligations to students with disabilities and yet repeatedly violated those obligations with respect to G.H. and his parents. The Board of Education of New Trier Township High School District 203 is the decision–making body responsible for ensuring the education and safety of all students attending its schools. Upon information and belief, the school board has been periodically apprised of and has made decisions concerning this matter and is sued in its official capacity. (These defendants combined will be referred to as "New Trier" or the "District")

8.     Dr. Paul Sally is the School Superintendent of New Trier Township High School District 203. As Superintendent, Defendant Sally is the official within the School District who is designated by law to administer the School District's schools under the direction of the local school board. 105 ILCS sec. 5/10-21.4. Superintendent Sally's predecessor Linda Yonke was the Superintendent of Schools at the time of G.H.'s attendance at New Trier during school years 2015-16 and 2016-17. Superintendent Sally now stands in her stead as her successor and is sued in his official capacity.

9.     Ellie Ambuehl was the special education director for New Trier from the time G.H. entered the District, in summer 2015, through summer 2017. She played a key role in the events in controversy and is being sued in her individual as well as official capacities.

10.     The Illinois State Board of Education (ISBE), headed by State Superintendent of Education Tony Smith, Ph.D., employed Impartial Hearing Officer (IHO) Mary Schwartz to conduct the administrative hearing in this matter and is responsible for providing the

administrative record to the court and to parties in the event that there is related litigation. Plaintiffs expect to voluntarily dismiss ISBE and Dr. Smith once this ministerial obligation has been completed. However, given the IHO's failure to track which documents had and had not been admitted and her failure to reveal after hearing which documents she was deeming part of the record, this process is likely to be unusually difficult and extended.

## PRELIMINARY STATEMENT

11.    Plaintiffs seek reversal of a decision rendered by Illinois State Board of Education (ISBE) Impartial Hearing Officer Mary Schwartz in a special education due process hearing titled G.H. v. New Trier High School District #203, ISBE Case No. 2015-0518. The decision was rendered after a hearing that took parts of eight days involving three consolidated due process filings by parents, the first on June 23, 2015, seeking changes in student's program as well as compensatory education and reimbursement for parentally funded services. The IHO summarized the issues raised by parents as follows:

a.    Whether the school district impeded the parents' opportunity to participate in educational decision-making regarding the provision of a FAPE to the student in one or more of the following ways:

i.    Failing to offer comparable services to those in the student's March 2014 IEP, developed at Safe Haven, at the time of transfer to District 203 or until a draft or an agreed-upon IEP was completed and implemented;

ii.    Failing to conduct timely annual and triennial reviews and thereby failing to have a completed IEP in place to address the student's unique needs prior to the start of each school year and corresponding ESY (ESY 2015, 2015-16 school year, ESY 2016, 2016-17 school year);

iii.    Failing to complete an IEP for the student prior to the beginning of the 2017-18 school year;

iv.    Predetermining the student's 2015-16 ESY placement and subsequent placements by changing the student's placement for the 2015-16 school year from a non-public therapeutic day school of about 22 students to a general education high school of over 3,500 students outside of the IEP process;

v.    Failing to provide progress reports and report cards in accordance with the IDEA and district procedures;

vi.    Changing the student's IEP outside of IEP meetings and without the parents' knowledge and consent by changing: content, goals, related services, education minutes, accommodations, and placement;

vii.    Failing to provide written 10-day notices of IEP changes;

viii.    Immediately implementing IEP changes without parental waiver of the 10-day notice period;

ix.    Failing to send timely IEP notices to the parents, including all topics to be discussed and a list of meeting participants, and if so whether that failure impeded the parents' ability to prepare for and participate in the meetings;

x.    Failing to have persons with knowledge about the student and his unique needs present at the IEP meetings, including parents' private providers and consultants and a general education teacher with knowledge of the student;

xi.    Failing to follow district procedures regarding the student's participation in school-wide and extra-curricular activities; academic courses, grading, testing, use of substitute teachers; homebound instruction in 2015-16;

xii.   Failing to provide the parents with consistent, relevant and accurate information about the student's instructional content, accommodations, and school day;

xiii.   Improperly limiting observations and communications to/from staff;

xiv.   Providing false and incomplete information to the parents;

xv.   Failing to hold IEP meetings requested by the parents in a timely manner; and,

xvi.   Failing to consider the opinions of district's outside consultants regarding the student's program and placement;

b.   Whether the district violated the student's right to receive a FAPE by failing to:

i.   Provide the student with a timely, appropriate program and placement, including access to general education classes and curriculum, to address all of his educational needs;

ii.   Provide the student with a program and placement that provided him a FAPE as written and/or as implemented;

iii.   Appropriately address the student's transition needs in the September 1, 2015 IEP and subsequent IEPs;

iv.   Provide sufficiently qualified and trained staff for the student to implement the student's program;

v.   Provide the student with equal educational opportunities to those of his non-disabled peers;

vi.   Meet the student's communication and assistive technology needs;

vii.   Provide a safe learning environment for the student, including supervision by certified staff and safe transportation to/from home, to other campus in school year 2015-16, and for extracurricular activities;

viii.   Provide the necessary supports and services for the student to meaningfully access extra-curricular activities, including timely registration information, trained staff, appropriate transportation, and communication support during extra-curricular activities; and,

ix.   Ensure that the student arrived to school before the first bell and was dismissed at the end of the school day at the same time as other students and if so, whether these failures resulted in the student not receiving the same amount of educational minutes as non-disabled students receive in a school day.

The parent-filed cases containing these allegations were consolidated with a hearing request filed by the school district on May 30, 2017, in which it claimed that the parents' attitude toward the school district had created a hostile relationship and irreconcilable differences between the parties such that the student's placement must be changed to a private residential school or a therapeutic day school.

12.   The district withdrew its May 30, 2017 complaint demanding a private placement shortly before hearing, on January 12, 2018, and at hearing, it presented a new request for affirmative relief—that it be allowed to change fundamentally the program that had been provided to G.H. at its high school campus. Its request for relief was summarized by the hearing officer as follows:

> The district requests an Order finding that the student's program and placement is as follows: a block schedule with a morning block (8:15 to 11:40), consisting of math instruction (40 min/day with 1:1 teacher), functional academics (small group instruction for functional academics in life skills class 40 min/day), preparation for living (independent life skills, social skills and weekly community based instruction), related services and breaks (restroom); lunch (with small group and 1:1 aide 40 min/day); PESO (adaptive physical education; and, an afternoon block schedule of reading/English instruction, supported vocational experiences,

related services, and break. Related service minutes include the following: 480 min/mth speech; 300 min/mth assistive technology; 240 min/mth occupational therapy; 360 min/mth physical therapy; and, 90 min/mth vision services. Related service providers will provide services flexibly across the schedule and will log minutes to verify that service minutes were provided. Additionally, the student's 1:1 teacher will serve as case manager, the 1:1 para-educator will be fulltime and in all settings, for the entire day, and an assistive technology consultant will provide bi-weekly consultation.

This was incorrect: in fact, the District had proposed 40 minutes each of 1:1 teacher services for reading/English and for math. Perhaps based on this error, the hearing officer ordered even more draconian cuts to teaching than the District had requested—just one 40-minute period rather than two. The IHO correctly cited the District's proposal for full-time aide support, and did not explain why she was ordering only part-time support, which no one recommended. The IHO did not comment on the District's general direction—which was to greatly reduce academic instruction in favor of a more "functional" program that District witnesses did not explain or, with narrow exceptions, support. The resulting decision has in some ways accentuated the disarray in G.H.'s education that prompted the hearing, and plaintiffs seek its reversal.

13.    In addition, Plaintiffs seek damages for violations by the New Trier High School District #203 of Section 504 of the Rehabilitation Act of 1973, which bars discrimination against students with disabilities, including failure to provide a free appropriate public education within the meaning of the Rehabilitation Act, as well as retaliation against students or parents for disability related advocacy. The Illinois State Board of Education lacks jurisdiction over Section 504 claims. Though the IHO noted that the family had complained that New Trier had not provided G.H. with equal educational opportunity relative to nondisabled peers, her decision did not address that claim. Families are not required to try to pursue internal processes in which districts determine whether they have violated Section 504. Parents have exhausted IDEA

administrative remedies as required in order to pursue Section 504 claims with similar potential remedies.

## EDUCATIONAL BACKGROUND BEFORE HIGH SCHOOL

14.    G.H. moved to Glencoe, Illinois for kindergarten, after receiving early childhood special education services in Georgia. Before high school, Glencoe students are part of the Glencoe School District, District 35. G.H. attended "life skills" special education programs in the district from kindergarten through second grade. Those programs did not feature academic curricula, and focused heavily on "functional" skills, which G.H. was unable to perform because of his physical disabilities. Alternative/Augmentative Communication was unsuccessfully attempted, using many of the same personnel and strategies later used by New Trier for G.H.

15.    Because G.H. was not progressing and the school district lacked other options, G.H.'s parents home-schooled him from third through fifth grades. During that period—using highly modified materials and techniques from early intervention programs and the field of applied behavior analysis – G.H. began making communication and academic progress. He began answering questions with yes, no, and I don't know and using a picture book, called a Pragmatically Organized Dynamic Display (a PODD book). He learned to read and do math. He had access to history and science concepts for the first time. He began using assistive technology more effectively. Reading opened the way for writing: he began spelling out words using a floor keyboard – a "floor keyboard" – a large mat on the floor with letters to which he moved, with one person's assistance for stability. For the first time, G.H. could initiate communication beyond his few vocalizations, rather than depending on choices offered to him by others.

16.    For sixth grade, G.H. had a combination program – partly at school and partly at home. Academic instruction was provided at home, while time at school focused on social opportunities

and communication. G.H. continued to make progress during this year.

17.    For seventh and eighth grades, the District 35 funded attendance by G.H. at Safe Haven

School, a private therapeutic school certified by the State of Illinois to educate students with

disabilities whose needs cannot be met in a general education setting. G.H.'s needs were very

different from those of other students at the school, most of whom had "internalizing" emotional

disturbances (i.e., depression and anxiety without serious challenging behaviors), and he required

additional services including a 1:1 teacher, a reading consultant, an Assistive and Augmentative

Communication consultant, and a health aide to assist with mobility, eating and toileting.

18.    Junior high at Safe Haven was the first time G.H. experienced a traditional academic

curriculum; he made rapid progress academically, and enjoyed being in class. He became more

capable of communication, through a combination of methods: a small set of meaningful

vocalizations for eat, finished, more and no; use of a Pragmatically Organized Dynamic Display

(PODD) book; yes/no/don't know choice cards; a yes/no/don't know long laminated rectangle on

which he could touch the answer; a yes/no application on an iPad; choices on the floor and wall,

and the "floor keyboard" – which included numbers and punctuation symbols as well as letters.

The floor keyboard was becoming harder to use as G.H. grew in size, making it harder for him to

move his body and harder for others to help. He was working on mastering a flip keypad, a

similar system which he could use by selecting letters with his hands, but was finding it much

harder than spelling by walking. It required different motor movements, and a two-step process,

first finding a set of letters, and then the letter within the set. G.H.'s reading decoding abilities

were several years below grade level, not surprisingly, given the delay in instruction, but

listening comprehension appeared to be intact, as did math ability. G.H. attended science class

during eighth grade with peers, and during both years he expressed pleasure in being with them

for lunch, assemblies, gym, field trips and recreation. During his junior high years, he attended many bar and bat mitzvahs, where he enjoyed dancing and "hanging out." Academically he was on a regular diploma track, and though his disability greatly complicated social interactions, he was enjoying being part of a familiar circle of young people.

19.     In June 2015, all the elements were in place for G.H. to succeed in high school. He would not be able to work at the same pace as peers on written output, but was able to take advantage of auditory and, with more complications, visual and hands-on instruction. He was looking forward to high school.

20.     Upon his entry into high school, G.H. had a communication system in place. It was complicated, and required familiar, trained partners, but it let G.H. express wants, needs, thoughts and opinions.

21.     G.H.'s development of a communication system was hard-won and fragile, because he develops motor patterns with great difficulty and loses them quickly with lack of use. Because of G.H.'s difficulty with motor initiation and motor planning, he has trouble learning new motor movements or using a single method to communicate consistently. He does better when a movement or sound that he has is shaped, then when he is required to learn a new movement. Also, because of G.H.'s inconsistency in motor planning, it is crucial that G.H. have multiple ways to communicate as some movements work better on one day/time then another. It is also important that G.H. have consistent expectations and practice across persons and settings so that the motor movement becomes natural, ultimately eliminating the need for planning.

22.     G.H.'s motor impairments with both motor planning and movement, make it difficult for him to consistently use the Augmentative and Assistive Communication Systems that are typically available for nonverbal individuals, and even by individuals with more significant

physical disabilities than him (e.g., people who have quadriplegia or are incapable of beareing any weight). Those systems include typing, direct selection of letters or icons of different sizes, single switch scanning where a person hits a switch when he/she hears what they want and two switch scanning where the person controls both the movement through choices and the selection, eliminating the timing component. Switches for these methods can be activated by various different body parts, e.g. head, elbow, knee, foot, hand, to name a few, whichever one a person has consistent control with. Technology also exists in which a person can select an item by focusing eye gaze on it, but G.H. has a cortical visual impairment which results in frequent disjunction between where he appears to be looking and where he is actually seeing at and a disconnect between eye gaze and reach. Often G.H. will look one way but want something other than what he is looking at. Eye gaze has been raised and discarded in every evaluation of G.H. including by the IEE by District 35 in May 2015 and the IEE by the Parents in June 2016. The District has recently offered a small trial of that technology, which is continually improving, to see if it is viable in fall 2018. It was . It was apparently not offered before because the District's consultant assumed that the District would want to first try a less expensive switch system.

23.    Because of G.H.'s difficulty with consistent motor initiation and planning, as opposed to lack of understanding or muscle movement, conventional high-tech switch scanning systems have traditionally been difficult to implement and use successfully with G.H., because there is no body part (arm, elbow, foot, finger, hand, etc.) over which he has consistent and timely control. With low-tech systems such as a yes/no/I don't know trifold and his Pragmatically Oriented Dynamic Display book, "smart partners" can see when G.H. is trying to communicate, give him time to do so, and re-present options as needed, checking for accuracy once a selection has apparently been made.

## G.H.'s EDUCATION AND DUE PROCESS HISTORY
## IN NEW TRIER HIGH SCHOOL DISTRICT

24.     In June 2015, G.H.'s education became the responsibility of the New Trier High School

District. His mother toured New Trier's East Campus (where sophomores-seniors attend) in fall

2014. School District 35 attempted to include New Trier in planning for G.H. at the beginning of

2015, when it became clear that he would not be able to remain at Safe Haven School for high

school. Unfortunately, New Trier did not take advantage of that advance notice to prepare.

25.     Two IEP meetings were held by School District 35, on May 22 and June 3, 2015 to

share information about G.H. as a learner with New Trier as well as to conduct his annual review

and matriculation IEP.

26.     These IEPs were not completed and as a result, G.H. matriculated from 8th grade and

School District 35 to New Trier High School District No. 203 on or about June 12, 2015 without

a completed IEP. One crucial missing component was an offer for programming for school year

2015-16 including, but not limited to, extended school year programming for summer 2015.

27.     On June 4, 2015, the District represented in an IEP Amendment that it would be

conducting an assistive technology assessment for G.H. to be conducted by two individuals, a

speech-language pathologist, Jill Senner, who had created G.H.'s PODD book, and an

occupational therapist, Bridgette Nicholson, who specializes in positioning for AAC use, and had

developed a high-tech system that did not work for G.H. in second grade. That "assessment" was

not completed, as is the general requirement, within 60 days of consent; in fact, a formal

assessment plan and consent were not used. However, when G.H. started in New Trier, Sener

and Nicholson both consulted with the District on his communication needs.

28.     The District scrambled to put together a summer program, relying on people who had

worked with G.H. previously under the auspices of his family and previous school district, and

located that program at school, with the stated intention that it would be a learning opportunity for District staff. Unfortunately, they barely observed. Tutoring services from people who had worked successfully with G.H. covered part of the day; the rest was haphazard and unclear.

29. Parents filed their initial due process complaint on June 23, 2015 requesting that the District complete an IEP for G.H. and provide him with an offer of a free and appropriate public education for school year 2015-16. This hearing request also requested that the District provide G.H. with maintenance of placement pending an agreed upon IEP.

30. ISBE initially assigned as the hearing officer Marcia Johnson ("IHO Johnson").

31. Several IEP meetings were held, including on July 13, July 24 and August 11, 2015 but at these meetings the primary topic of discussion was goals, leaving other areas of the IEP not discussed, much less completed.

32. Not discussing GH's program and placement at an IEP meeting was purposeful on the part of New Trier. According to an August 10, 2015 email from Ambuehl to school team members, the plan for the August 11th IEP meeting was to terminate it before G.H.'s program and placement could be discussed.

33. On August 14, 2015, Ambuehl provided a draft IEP to the Parents which for the first time described a placement and programming for G.H. at New Trier for school year 2015-16.

34. This program and placement was different than anything previously shared.

35. On or about August 18, 2015, Ambuehl told G.H.'s Advisor, Tim Estberg, that the placement/program information she had shared was final.

36. On August 19, 2015, after the first day of school, Ambuehl met with D.H. and their respective counsel to discuss this "draft" IEP.

37. On August 28, 2018, without IEP team discussion and over the objection of D.H.,

Ambuehl unilaterally finalized an IEP for G.H. and sent a complete copy to the Parents on September 1, 2015.

38.    This IEP was already being implemented by the District on August 18, 2015, the first day of school.

39.    This IEP did not include a ten-day notice of conference recommendations, indicating that it was a final IEP.

40.    The Parents did not agree with the IEP implemented by the District on August 18, 2015 and finalized by the District on August 28, 2018. The program reduced G.H.'s time with a certified 1:1 teacher from all day to 3 hours. Assistive technology which had been discussed that would allow G.H. to access the classroom remotely at times, without disturbing peers, was not pursued. Classes were chosen by District staff and were not appropriate, in some cases, nor were appropriate accommodations provided for courses that should have been accessible to G.H. The District decided on safety grounds not to use G.H.'s only way of spontaneously communicating —by having one person provide physical support while he moved from letter to letter on his floor keyboard—insisting that two people be at each of G.H.'s side; unfortunately, as the family had explained, that would and did not work.

41.    On September 7, 2015, the Parents filed a Request to Enforce Stay Put and Leave to Amend Hearing Request.

42.    The District filed a Response to Parents' Request and on September 16, 2015, the Parents filed their Reply along with its list of items still needed to be discussed by the IEP team in order to finalize the IEP.

43.    Despite the Parents' complaints about ongoing and shifting unilateral changes in placement, reduction of academic instruction minutes, untrained staff and GH's relegation to

being in a room alone with a rotating group of multiple aides, their Request to Enforce Stay Put

was not ruled on by the hearing officer until March 20, 2016.

44.    Additional IEP meetings were held on September 30 and December 1, 2015; however,

the District still did not complete an IEP for G.H.

45.    The District continued to make unilateral changes to GH's program and placement, that

included, but were not limited to, decreasing academic instruction, changing the level of

instruction, revising and eliminating goals, all without the knowledge or consent of Parents, New

Trier hired private consultants who knew G.H., but staff sporadically applied some of their

guidance and rejected much of it. Numerous aides worked with G.H. without learning how he

communicated. Attempts to use the floor keyboard with two staffers failed. Moving to a letter or

symbol on the floor with people on each side was a completely different motor movement, which

he could not do; instead, he tended to go limp. G.H.'s mother and private provider realized that

the floor keyboard was not sufficient or necessarily viable long term; unfortunately, New Trier

also did not carry through with plans to teach him to choose letters through a less physically

taxing and potentially much quicker flip pad held by a partner (in which he would he would first

touch a page with a group of letters, and then select the one he wanted).

46.    A vicious cycle set in. Because G.H. could not communicate without the floor

keyboard, staff assumed he lacked knowledge. Because staff viewed him as incapable, made

clear in his presence that they thought his abilities were being exaggerated, and indeed he could

not communicate at school with the unmastered techniques being offered, he became

demoralized about school and regressed in communication skills and intent. Early in freshman

year, math instruction was abandoned, even though G.H. had spent the previous summer filling

in holes so as to be ready to start algebra. Since he could not express knowledge using tools

available at school, staff assumed that previous educators had greatly exaggerated his abilities. Private conversations to that effect occasionally spilled over into IEP processes, but mainly served as the basis for unilateral decisionmaking by staff to curtail academic instruction or to go through the motions of teaching in order to appease D.H., without expecting mastery. Rather than recognizing that—as the IHO found—G.H. had regressed since arriving at high school, staff assumed that previous abilities had been much exaggerated.

47. Instead of acknowledging G.H.'s ability to communicate through a range of low-tech methods—and working to restore, maintain and develop that capacity while pursuing more efficient methods going forward--District staff became fixated on the notion that there was a technological solution that would allow G.H. to communicate independently, removing any concern that communication partners were influencing output.

48. By the middle of freshman year, though the joint Augmentative and Assistive Communication assessment by Senner and Nicholson had not been completed, and no report had been issued (nor has one ever), Senner's role was fading and Nicholson's growing.

49. Senner did some staff training, but had not been given an opportunity to do necessary training of the large number of people working with G.H. Approaches to communication were limited and inconsistent. Systems were not set up for G.H. to participate in many of the social and academic activities to which he was exposed; he was, of necessity, a spectator, and an increasingly disengaged one.

50. Nicholson was mainly in charge of AAC planning for G.H. despite her lack of broad communication expertise and her concentration on high-tech approaches which were of dubious relevance for him. Nicholson quickly concluded that G.H. had too many communication systems, and that the floor keyboard should be eliminated immediately. Her view was that he had

no real way to communicate, and needed a set-up similar to that she had tried before, unsuccessfully with him, in elementary school. Nicholson recognized that automatic switch scanning would not work for G.H., because he could not sufficiently time his responses. She determined that he needed a two-step switch scanning system. With one switch, G.H. would control presentation of options. He would move from one option to another, and would have as long as needed before using the second switch to make his choice. G.H.'s parents want him to be able to communicate independently and have deferred to the District's view that this is his best hope for doing so. But numerous problems emerged with the consultants's plan: G.H.'s hands are not equal in their ability to hit switches and nothing has been done technologically or via occupational therapy to improve his weaker hand's switch activations. The activities set up for switch practice have been glitchy--they do not always work as they are supposed to, meaning correct responses are often not reinforced. It took the District over a year to acknowledge and agree with some of the private providers' concerns on these points. However, problems have still not been resolved. Practice items have been selected without sufficient regard for whether they interest G.H., or his progesss on them, and offered for long periods of time in lieu of academic instruction, which he enjoys and is aware of missing.

51. The decision to rely on switches had implications for positioning G.H.'s body. Though he had historically focused better while moving—for instance, sitting on swings and rocking chairs while listening to information being presented, and enjoys movement and needs it for overall fitness—Nicholson believed that he needed to become accustomed to sitting still in a wheelchair for much more of the day, in hopes that the wheelchair could be equipped with switches for mobility as well as for communication, ultimately perhaps yielding "independence." G.H. has many involuntary hand movements, which led Nicholson to develop a strapping system

designed to confine his torso, arms, and hands so that he could learn the refined movements needed to hit switches purposefully, and avoid extraneous movements that might inadvertently trigger them. Again, G.H.'s parents deferred, consenting to use of "the system" to restrain G.H.'s movement during parts of the day in which he was actively involved in learning to use switches. G.H. often resists that system-- rocking, throwing his head back, verbalizing that he is finished-- making it unclear whether it can ever lead to mastery of two-step switch scanning. G.H.'s parents were alarmed to learn that staff had been using the "system" not only during switch practice but for "calming" and to keep his hands out of his mouth. Another problem in implementation of two-step switch scanning is that staff appear to have assumed that G.H.'s performance, which fluctuated around random levels, with progress glacial (and simultaneous failure to exhibit previously mastered communication techniques) reflected limited cognitive capacity, though in fact what seems to have been interfering with communication were poor motivation for the monotonous tasks being provided, demoralization as a result of being perceived as incapable, electronic glitches, and failure to reinforce desired behaviors and inadvertent reinforcement of undesired behaviors ( i.e., staffers' failure to take into account basic learning principles, such as that getting a song for switching on its icon needs to be more appealing than getting a conversation upon choosing a blank icon). Finally, everyone has agreed that for G.H. to master two-step scanning, he needs to have it available at home as well as school. Home access to equipment has been sporadic and appears to have been controlled more by District counsel-- responding to legal developments--than by educators charged with teaching G.H. to communicate. Access has been intermittent, and over long periods has been withheld because the family refused to sign factually incorrect release documents: for instance, even though they were willing to accept liability for the device and release the district from any injuries associated with

it, they sought to change wording that incorrectly claimed they had already been trained to use it.

52.    The IEP developed on December 1, 2015, and shared with the parents on December 14, 2015, reflected the District's desire to change G.H.'s program not by offering services with which he had previously been successful, but by reducing expectations.

53.    Despite the fact that this IEP was labeled draft, and did not include a ten-day notice of conference recommendations, similar to other IEPs, the District began implementing selected pieces of it immediately. For other portions that were agreed to, District staff changed their minds after the meeting and did not implement.

54.    On December 24, 2015, the Parents filed an Amended Hearing Request requesting that it be treated as both leave to file an amended hearing request and as the amended request itself.

55.    The District contested the Parents' filing of an Amended Due Process Hearing Request and in January 2016 filed a Motion to Strike it.

56.    The basis for the District's Motion to Strike was that the District did not consent to the amendment of the due process request, the parents did not seek leave to file an amended request and the parents acted in a dilatory manner in their request to amend resulting in prejudice to the District.

57.    On January 11, 2016 the Parents' filed their Response to the School District's Motion to Strike Parents' Amended Due Process Hearing Request. In that Response the Parents' highlighted the District's failure to offer G.H. a timely offer of a FAPE, the ongoing changes made to his program and placement without appropriate notice to and participation of the Parents along with a wholesale disregard of stay-put while a mutually agreed upon IEP was being developed.

58.    On February 22, 2015, G.H. was taken to the nurse's office for a head injury.

59. This injury occurred while G.H. and an aide were alone in a room, and he was sitting in a "system" created to restrain his body while sitting in a specialized wheelchair. The ostensible purpose of restraints was to allow G.H. to learn more refined motor movements and to cut down on involuntary, random movements; however, in early 2017 D.H. learned through a review of emails that the system was also being used to keep G.H. "calm" and to keep him from putting his hands in his mouth. Staff provided contradictory information about how this system was being used at hearing.

60. The nurse contacted D.H. and told her that G.H. required stiches to close the wound in his head.

61. The aide stated that he did not know how the injury occurred.

62. At the emergency room, G.H. received three staples to close the head wound and the E.R. contacted the Department of Children's and Family Services (DCFS), which deals with suspected neglect and abuse. Following the injury, New Trier informally indicated that G.H. would be with the same aide upon his return, along with a 2nd staff member, at all times.

63. Following this incident, G.H.'s mother verbally requested homebound services and supports and indicated that G.H. would not return to school unless the District made changes to his program and placement to ensure a safe environment for him.

64. In April 2016, parents reiterated their request for homebound services, and a few days after the District requested a doctor's note, the parents delivered one making clear the need for these services.

65. The District agreed to provide homebound services to Garrett, yet none were provided. The District appears to have sought a volunteer to provide services rather than assigning a staff person to this role. The District did not reimburse parents for services they obtained unilaterally

during this period.

66.    IEP meetings were held on January 28, 2016, February 23, 2016 and April 11, 2016 to discuss various topics such as communication and plans for the upcoming triennial evaluation, but the District did not make any attempt to complete an IEP for G.H. or revise it to reflect a second aide or homebound services.

67.    On March 20, 2016, IHO Johnson ruled on the Parents' Motion for Stay Put finding that the March 2014 IEP at a non-public therapeutic day school placement was the stay-put IEP.

68.    However, IHO Johnson ruled that because that placement no longer existed through no fault of the District, the District was not required to maintain a pendency of placement for G.H.

69.    On March 20, 2016 IHO Johnson also denied the Parents request to amend their due process hearing request to include new and continuing violations of the Individuals with Disabilities Education Act ("IDEA") on the basis that to do so would prejudice the student when "there is no current IEP in place at this time..."

70.    On March 26, 2017, the Parents filed a Motion to Reconsider this ruling, which was briefed by the parties, and on April 27, 2016, denied.

71.    Despite multiple requests by D.H., no IEP meeting was held to discuss GH's program and placement for ESY summer 2016 and school year 2016-17.

72.    As a result, the IEP team did not consider G.H.'s need for ESY summer 2016 nor provide it to him.

73.    In emails, Ambuehl informally acknowledged G.H.'s need for ESY but did not provide, nor compensate Parents' for, services for him.

74.    Throughout the 2015-16 school year, G.H. was denied opportunities to participate in extracurricular activities. New Trier excluded G.H. from activities right before school started in

which peers in his advisory class got to know each other. New Trier's conceded practice was to make participation by disabled students in extracurricular activities dependent on finding staff volunteers. New Trier staff did know know, or try to learn, how G.H. could participate actively in activities like dancing, rather than watching.

75.    At the end of freshman year, the reading and and assistive technology consultants who had worked with G.H. shared concerns with Ambuehl regarding the deterioration in his program. She did not respond. It became clear over the next few months that Ambuehl was unilaterally discontinuing these services, despite provisions in what the District claimed was the stay-put IEP that included them.

76.    On June 29, 2016, IHO Johnson ceased acting as an ISBE hearing officer and so ISBE appointed Mary Schwartz ("IHO Schwartz") to take her place.

77.    At that time, G.H.'s parents were asserting that the due process hearing on the June 23, 2015 due process hearing request would be lengthy and likely to exceed seven (7) days.

78.    IHO Schwartz stated that the hearing would be completed in 7 days and would not go longer than that.

79.    Parents D.H. and R.H. filed a second Due Process Hearing Request on July 5, 2016 and amended it on July 10, 2016, alleging multiple procedural and substantive violations of the IDEA by the District during school year 2015-16.

80.    Over the objection of the parents, IHO Schwartz consolidated this hearing request with the one filed on June 23, 2015.

81.    Even as time passed and additional hearing requests were filed and consolidated, IHO Schwartz maintained the position that she would allocate only 7 days for hearing.

82.    DCFS advised the family after the February injury that G.H. should not go back to

school until the case was resolved. DCFS did not resolve the case until mid-July 2016, at which point D.H. tried even more urgently to get the District to prepare for the 2016-17 school year.

83.    On or about August 25, 2016, Ambuehl provided the parents with an "interim program" for G.H. for the 2016-17 school year, which began on August 29, 2016. This program included a class schedule, which New Trier has represented is normally done by Individualized Education Program teams.

84.    Instead of providing the program as described in the "interim plan," the District provided GH with an alternate program, but continued to provide him with grades in the classes listed in the "interim program" as if he attended them, even though he did not.

85.    Ambuehl did not share the fact that the interim program she provided to his parents was not being provided. Instead, parents were left to figure it out for themselves.

86.    Neither the interim program nor what New Trier actually provided was substantively appropriate.

87.    The District did not provide math instruction during sophomore year, again abandoning G.H.'s strongest subject.

88.    The District planned again to have a teacher for 3 hours per day, but sent G.H. to a special education classroom with aides until such a person could be hired. The novice teacher New Trier employed was abruptly terminated after about six weeks, after she attempted to evaluate G.H. without required parental consent, at Ambuehl's direction, and unsuccessfully sought from Ambuehl programs to use with G.H.

89.    After her discharge, the District insisted that an instructional assistant working with G.H. was also a credentialed teacher, and was now serving in that role. When D.H. pointed out that his only certification from the Illinois State Board of Education was as an instructional

assistant, the school board's attorney claimed that the state website was in error. Shortly afterwards, Ambuehl realized that the aide was not certified as a teacher, but neither she nor the school board's attorney informed the parents.

90.    The parents' requests for an aide so that G.H. could participate in extracurricular activities were at first not met and then ignored. As a result, he could not participate in dances, Special Olympics and clubs during the 2016-17 school year.

91.    In fall 2016, the District requested that the IHO order an Independent Educational Evaluation of G.H. by Dr. Rachel Loftin, and the IHO did so.

92.    This evaluation was not completed until September 2017, approximately ten (10) months after it was ordered.

93.    Eventually, in January 2017, the District hired another novice teacher for three hours per day, who worked with G.H. from February on, but without appropriate curricula or materials. G.H. was issued grades that had no connection to performance or the classes he actually took. He was not expected to read or write at school. Much of his time sophomore year was spent on switch practice, which mostly consisted of requesting songs and videos; results were nearly random.

94.    About an hour a day was spent on wheelchair "practice" without a goal or plan to achieve progress in independent mobility. The family sought goals for, and information on, this informal trial, for the most part unsuccessfully. Eventually it became clear that G.H. was able to use the switch for move forward for short distances, but not stop or turn. Attempts by the family to change practice so that it would be motivating (i.e., so G.H. could go somewhere he wanted to be) failed.

95.    Previously formulated IEP goals were not worked on with G.H. during school year

2016-17, nor was the December 2015 draft IEP---the IEP in place according to the District--honored.

96.    During the 2016-17 school year, the District convened IEP meetings on March 1 and May 22, 2017. Yet, the District continued not to offer an IEP containing all required components.

97.    In spring 2017, at the direction of New Trier attorney Dana Crumley, staff drafted academic goals as what she called a "carrot" to get D.H. to settle the case.

98.    The District acknowledged that the program it was providing to D.H. was not working.

99.    At an IEP meeting on March 1, 2017, the District offered to place G.H. at the Felicity School, a state approved non-public therapeutic day school with a one to one teacher and aide. The Felicity School was willing to accept Garrett and to create the same kind of program for him in which he had thrived during middle school at Safe Haven School.

100.  To facilitate this change, at the March 1, 2017 meeting the District changed GH's eligibility to OHI primary and changed his placement to a non-public therapeutic day school, specifically Felicity School. The Parents agreed to these changes. That IEP was not otherwise reviewed or discussed at this meeting.

101.  On March 10, the District provided the Parent with a copy of the IEP purporting to be final even though it had not been discussed on March 1· and goals had been added after the March 1 meeting.

102.  The March 10 IEP document did not have a ten-day notice of conference recommendations indicating that it was a final IEP.

103.  Following presentation of the supposedly final IEP, counsel for the District indicated that this IEP should be labeled a draft, and then later told the parents it was final even though

internally staff viewed it as a draft.

104. After the March 1 IEP meeting, District attorney John Relias rescinded the IEP team consensus placement after the March IEP meeting via correspondence, outside of the IEP process. He visited Felicity, and expressed concern that the classroom that G.H. would work in was near a basketball court, which for unexplained reasons he saw as unacceptable, and because the general population of the school was dissimilar to G.H. That was inevitable given his combined, extremely low-incidence disabilities, and was not troubling given how well he had done during junior high in an individualized program located at a school for students with "internalizing" emotional disabilities.

105. The District then convened an IEP meeting on May 22, 2017 for two hours, for the designated purpose solely of reviewing the goals in the IEP provided on March 10, 2017.

106. At the May 22, 2017 IEP meeting only goals were discussed and then a final IEP was provided.

107. The placement at Felicity School remained in the May 22, 2017 IEP for ESY 2017 and the 2017-18 school year.

108. The May 22, 2017 IEP did not provide the Parents with a 10-day notice of Conference Recommendations.

109. The May 22, 2017 IEP contained changes from the December 2015 draft IEP (which the District claimed to view as "stay put") that were never discussed as an IEP team or shared with parents.

110. The District did not provide G.H. with placement at Felicity School as agreed on March 1, 2017, or make another offer of a free and appropriate education for ESY 2017 or the 2017-18 school year.

111.  On May 30, 2017, the District filed a Due Process hearing request against the parents alleging that the parents' attitude toward the District had created a hostile relationship such that the student's placement needed to be changed to a non-public therapeutic day or residential placement. It would not, however, allow G.H. to attend the sole school which had been identified as ready and willing to meet his needs.

112.  The Parents filed a Notice of Insufficiency, which was denied.

113.  On September 18, 2017, a third due process hearing request was filed by the Parents alleging multiple procedural and substantive violations of the IDEA by the District during the 2016-17 school year.

114.  IHO Schwartz consolidated the September 18, 2017 due process hearing request with those filed by the parents on June 23, 2015 and July 10, 2016 and the one filed by the District on May 30, 2017.

115.  IHO Schwartz stated concerns about a hearing being able to be completed in seven (7) days, but continued to represent that it would be completed within that timeframe even as she delegated doing so to counsel.

116.  The 2017-18 school year started on September 7, 2017.

117.  New Trier did not follow the December 14, 2015 draft IEP in providing GH with a stay put placement for the 2016-17 and 2017-18 school years even as they represented that that was their plan. A key difference is that New Trier did not provide consulting services needed to address G.H.'s unique communication needs; while consultants continued to participate to varying levels, they were paid by parents rather than New Trier, and their recommendations were frequently resented by staff and not implemented. Other key differences included, but are limited to, the goals, home-school communication, staff training, level of academic instruction and

29

sensory supports.

118.  This program and placement provided to G.H. during the 2017-18 school year, his junior year, was different than that provided to him during school years 2015-16 and 2016-17, as was the process that produced it.

119.  For the 2017-18 school year, G.H.'s junior year, the District had a new special education director, Laurel Burman ("Burman"), who took a different approach to this case. She Burman retained a long-standing New Trier instructional assistant, who had teaching certification. He knew G.H. slightly as a neighbor and as an aide from special recreation activities, and who had experience assisting a sibling with a disability. Burman hired him for the entire day, not just three hours. Burman also assigned primarily one aide to work with G.H. instead of up to five different ones in a single day, as had been the prior practice.

120.  On August 29, 2017, Burman and District counsel met with D.H. and a family consultant to discuss G.H.'s schedule. At that meeting, the District provided D.H. with special education course selections to choose from. New Trier restored some of the academic instruction that had been denied during sophomore year.

121.  After that meeting, the District advised that GH's stay put placement was the December 14, 2015 draft IEP but utilizing the May 22, 2017 IEP goals. Parents disagreed with the District's unilateral determination of stay put – taking pieces of different IEPs to create a program/ placement that was not mutually agreed. Moreover, the District was not really following the December 2015 IEP, as it had withdrawn crucial consulting services from non-District providers, eliminated key sensory supports including apparatuses for movement, which, as the IHO noted was "the 'best way' to help him regulate himself"*(Decision,* p. 11), and changed the home-school communication plan, to name a few.

122. As a result of this continuing denial of stay put for G.H. he was deprived of any maintenance of placement from the District since June 2015 when he matriculated from 8th grade to high school. Instead he received either no program/placement or a different program and placement each year that he attended New Trier at the discretion and determination of the District. Though the District has blamed G.H.'s parents for lack of progress and for lack of IEP completion, it has controlled both the meeting process and his education since his arrival.

123. At IEP meetings in October 2017, the District and family reviewed the Independent Educational Evaluation conducted by Dr. Rachel Loftin requested by the District and ordered by IHO Schwartz. The District had selected Dr. Loftin, but ignored some of her most important recommendations about how to develop a program internally for G.H. Instead the District' focus was not to collaborate with D.H. but to bully her into accepting a residential placement.

124. Instead of using Dr. Loftin's recommendations and collaborating on a program and placement for G.H., District counsel John Relias focused on telling D.H. that G.H. needed to go to Heartspring, a residential placement for lower functioning students with autism who have severely challenging behaviors. No one other than John Relias ever suggested this placement would make any sense for a non-autistic student with motor and cortical visual impairments, including Heartspring itself.

125. G.H.'s new teacher was well-intentioned, and worked hard to teach him; however, he was a newer teacher and did not receive training by persons who had successfully taught G.H. before. Without needed visual accommodations, appropriate presentation of communication options, behavior supports and expectations of competency and success, G.H. continued to be unsuccessful, providing responses that tended to be random, even though he liked his new teacher.

126. At the conclusion of the October 2017 IEP process, the District proposed a "block schedule," but refused to create a detailed proposal unless and until the parents agreed to implement this approach, leaving their proposal too vague for the parents to consider.

127. The Parents did not file a due process hearing request regarding the specific procedural and substantive violations of IDEA that occurred subsequent to the one filed on September 18, 2017, ten days into the school year.

128. The District's focus shifted to having a hearing as soon as possible in this long-standing pending case, or getting the parent to agree to a residential placement far from home which it would fund, but which would eliminate day-to-day involvement by the District with G.H.'s program.

129. Before the due process proceeding, G.H.'s mother visited HMS in Philadelphia, which appears to be the only program in the country that specializes in educating students with severe cerebral palsy. It was clear that the District's focus was on offloading G.H. and his mother Increasingly pessimistic that New Trier was able—or could be made willing—to educate G.H. internally, she was open to this alternative. The District refused to postpone the hearing so that it could be determined whether the program would accept G.H. or be appropriate for him. His mother did the second part of the travel process—with she and her husband taking G.H. for assessment at HMS—as soon as she could, shortly after hearing. Ultimately, HMS did not accept G.H. The students at HMS spend nearly all their time in wheelchairs, while G.H. can and prefers to move, though he needs support. Its students use AAC that depends on pushing buttons and/or using eye gaze, neither of which has worked for G.H., though the first formal trial for eye gaze was finally proposed after hearing. HMS's staff disapproved of the "system" used to restrain G.H.'s movements in hopes of eventually improving his switch use skills. They recommended

discontinuing it and continuing use of the PODD.

130.  Even as multiple status calls and pre-hearing conferences were held, and though four hearing requests had been consolidated, IHO Schwartz never reviewed the proposed witness list and estimated times with the parties but simply told them that they had seven (7) days for hearing and to work out a witness schedule. Parents' counsel indicated during calls and at hearing that this was insufficient but did their best to comply.

131.  On January 12, 2018, the District withdrew its due process request against the parents. Though the District had no pending hearing request, the IHO invited both sides to present requests for relief. The District's request was vague and did not indicate what the content or level of instruction would be in English/Language arts or in math. Though the District had no pending case, it sought fundamental transformations in G.H.'s Individualized Education Program that had never before been set forth intelligibly in an IEP meeting and still were not clear in the request for relief.

132.  Shortly before hearing, District counsel represented to IHO Schwartz and counsel for parents that there was videotape of G.H. that staff had taken at school that it wanted to admit at hearing.

133.  District counsel falsely represented that this videotape was taken with parental consent and copies provided to the parents.

134.  In fact, the videotape of G.H. was not taken with parental consent and only some of the videotape taken had been provided to the Parents.

135.  A due process hearing was held on January 29-31 and February 1-2, 4-6, 2018 at the District.

136.  At hearing, IHO Schwartz did not admit exhibits or make clear which exhibits she had

included in the record. Before the due process hearing convened, the IHO directed the parties to submit exhibits. Student submitted sequentially numbered exhibits divided into over 200 tabs, across seven notebooks, and an accompanying index. New Trier also produced about seven notebooks, but each notebook began with Exhibit (1). Overall, the District produced a similar volume of material, but with fewer dividers and a less informative index.

137. On the first day of hearing, the hearing officer seemed to endorse the parties' view that materials submitted by both sides would be in evidence.

138. Later, she seemed to imply that for documents to be admitted, they needed to be mentioned and there needed to be testimony about them, sending around a list of what documents she thought had been mentioned, which was unreliable, since she did not notice that the District's exhibit numbers were duplicated across binders.

139. During and after hearing, it was unclear what exhibits had been admitted. The District' confusing labeling and the hearing officer's conflicting signals as to criteria for admission further complicated presentation of evidence in a case already hampered by unrealistic time constraints—constraints that had not changed though three consolidated cases were being heard.

140. On the last day of hearing, rather than taking admitted evidence for use in decision making, the IHO returned all evidence to the parties and directed them to figure out and give back to her what had been admitted.

141. The District, which had three lawyers at hearing, appears to have assigned one to this; the family's sole counsel did it as well.

142. At the same time, the parties wrote closing arguments and reply briefs.

143. IHO Schwartz often could not recall the names of persons who testified or the questions that she wanted to ask.

144. IHO Schwartz often did not rule on evidentiary objections.

145. At numerous points in the hearing, counsel for the family wanted more time with both adverse and friendly witnesses. Both were providing very helpful testimony. Plaintiffs secured valuable testimony from District staff, independent professionals, and special education consortium professionals, and they wanted more time for numerous witnesses. Over and over, New Trier tried to get witnesses off the stand and limit the scope of questioning of its own staff.

146. IHO Schwartz summarily rejected the parents' request for additional time for examination of witnesses in order to be able to present their case as alleged in three due process hearing requests on the merits. Instead she indicated that there was a schedule that must be followed.

147. Contrary to her treatment of the parents' request for extended time for testimony, when District counsel requested a break in the middle of hearing to examine previously disclosed and clearly labelled records on which its counsel had not focused, the IHO granted them time, which came at the expense of time for testimony.

148. At hearing, District counsel misrepresented the existence of videotape contrary to the testimony of District witnesses.

149. After the existence of additional videotape was discovered, District counsel failed to provide the additional videotape to Parents' counsel in a timely fashion for review and use at hearing.

150. As a result of IHO Schwartz's actions with respect to witness testimony and exhibits, parent and counsel indicated at hearing on multiple occasions that they would be submitting a proffer of testimony from G.H.'s mother, D.H., for the record.

151. IHO Schwartz did not set a time frame or parameters for this proffer.

152. On April 7, 2018, IHO Schwartz issued her Final Determination and Order in this case. Even then, she did not provide a final list of admitted exhibits to the parties.

153. On March 24, 2018, the Parents submitted to IHO Schwartz their proffer of D.H.'s testimony solely for the record, and on March 29, they responded to her "return" of that proffer and submitted accompanying exhibits.

154. IHO Schwartz refused to accept the proffer for the record and returned the hard copies to counsel.

155. Throughout this case, plaintiffs have sought to have evidence in the record—though most of it was generated by New Trier staff—while New Trier has sought to limit information available for consideration, eventually objecting to admission of evidence that it had produced in its prehearing disclosures.

156. Thoughout this case, and with increasing urgency as the amount of time and number of issues in controversy expanded, plaintiffs have indicated that more time should be allotted to hear this case. Earlier in proceedings, New Trier recognized that the case would take more than seven days to try, but eventually changed its position, apparently when counsel realized that lack of sufficient time would inhibit the parents' ability to present evidence on the multiple programs and placements the District had provided, and suggested, for G.H. New Trier eventually took the position that seven days was sufficient. Those discussions were included in pre-hearing conference disclosures but not discussed by the IHO.

157. Despite the limited time for hearing, to which they repeatedly objected, plaintiffs elicited sufficient testimony and presented sufficient documentation to meet their burden of persuasion on the major procedural and substantive issues they had raised, with respect to the 2015-16 and 2016-17 school years and the summers of 2015, 2016, and 2017, including failure

36

to have an IEP in place by the beginning of the 2017-18 school year. They offered a proffer to fill in gaps, for instance, providing more detail on parental expenditures that were made because New Trier was providing insufficient, or no, services. Moreover, Illinois school districts bear the burden of production of showing that they procedurally and substantively complied with IDEA. For many issues, the District failed even to meet that burden. For instance, it put on no evidence that it met the student's math needs or his written language needs, and responded to criticisms of communication interventions more by seeking unfairly to blame D.H. than by defending its own efforts. The IHO ignored the District's burden of production entirely.

158. The IHO muddled the burden of proof issue by inviting the District to submit a proposed remedy as to an issue neither side had raised in a hearing request—what would constitute appropriate services for the 2017-18 school year. The family did not file a hearing request on that year because they were trying to see whether the current situation in New Trier— with a full-time teacher who, though his previous experience was almost entirely as a rather than as a teacher, had rapport with G.H. and did not seem to presume he was incapable of learning; one main aide; and a restoration of academic instruction—could be made to work. The District also did not file a hearing request to show that its proposal was appropriate; had it done so, it would have had the burden of proof to explain what its request was, and why G.H.'s program should be so drastically altered. Instead, the District simply presented a request for remedy in a case based on parent complaints, and the IHO granted it without addressing which party had the burden of proof (or noting the District'

159. The IHO ignored much witness testimony even though in a departure from usual practices, a transcript was available before the decision was due. She cited testimony selectively in a manner that yielded factual errors which consistently favored New Trier.

160.  The IHO relied heavily on documents—mainly IEPs presented by New Trier—despite the confusing nature and contested status of those documents, and did not allow sufficient time for the parent or District representatives to be questioned about their contents, their misleading dates, which were and were not drafts, which were and were not considered to have been agreed upon and what aspects were actually agreed upon, which were and were not implemented, and which were produced based on meeting discussions and which were modified thereafter.

161.  It was requested that IHO Schwartz include the denial of acceptance of the proffer in the record but it is unknown if she did so.

162.  The IHO failed to rule on key issues:

a.  The IHO ordered that G.H. be offered "functional academics" along with reading, English and Math, where the nature and level of instruction were not specified. Neither side advocated "no academics" or "useless academics;" the controversy was over what kind of academic program is "functional" for G.H. The family made clear that he needs to be able to read, because it is a critical way of gathering information and identifying material to access auditorily; write, because it is the only way that he can communicate spontaneously and with his own thoughts as opposed to being dependent on choices offered in low-tech or high-tech systems or via yes-no questions; and do math, because it is a historic area of academic strength and motivation and is relevant to his expressed career interests. They made clear that he is interested in science and social studies and needs to have things to think and talk about. District witnesses did not share what they thought was "functional," but District counsel asserted that algebra and exposure to age-appropriate literature were not. The decision told the District it could shift some unspecified amount of time to "functional" instruction, but provided no clue as to what that consists of for G.H., who because of his motor impairments

will not be alphabetizing mail, buying things with coins and bills independently, etc.

b.   The IHO neither granted nor denied New Trier's request to spend more of G.H.'s day on 2-step switch practice or on power wheelchair use.

## CLAIMS FOR RELIEF

—COUNT ONE—
Against New Trier High School District and its Board of Education

*Individuals with Disabilities Education Improvement Act of 2004*

163.  Plaintiffs reallege paragraphs 1 through 162 and incorporate them herein by reference. The educational opportunity created by IDEA is protected by an administrative hearing and judicial process that is available to a parent or student dissatisfied with the identification, assessment, or educational program offered by the local educational agency. 20 U.S.C. § 1415.

164.  The right to pendency of placement during due process proceedings is a core right in IDEA. The denial of stay put as to placement and programming to G.H. by New Trier caused great harm to G.H. and requires compensatory education as a remedy.

165.   Parents should have prevailed in the due process proceeding on most if not all issues and they and G.H. should have received substantial relief. They did not prevail, because of legal errors, factual errors, and procedural errors in conduct of the due process hearing, which separately and in combination warrant reversal of the IHO's decision.

166.  The IHO committed multiple legal errors in rejecting the family's claims:

a.   The IHO's compensatory education award ignored the purpose of compensatory education—to provide extra services beyond those required to afford a free appropriate public education that make students whole for denied opportunities. The hearing officer recognized one very significant problem—finding with respect to the parents' claim that the

district did not provide sufficiently qualified and trained staff" that "the events at the start of the 2016-17 school year, which resulted in a permanent special education teacher being in place at the beginning of January was not in compliance with his IEP and educational needs and did deny the student a FAPE for that period of time." However, the remedy was unrelated to loss of academic instruction, and reflected what the District should have been doing, and to some extent had been doing, anyway: "The compensatory education shall be in the form of activities with peers, such as Special Olympics or some other peer-related activity."

b. The compensatory education offer was vague, essentially remanding to the District's IEP team how much and how it would provide in the way of social/recreational activities to compensate for four months without adequate academic instruction via social activities.

c. The IHO confused holding multiple IEP meetings with honoring parents' rights to participate in IEP development and monitoring; the former happened, but the latter did not. IEP meetings were not conducted so as to reach conclusions; the District convened and ran those meetings, and was responsible for lack of closure.

d. The IHO essentially ignored parents' argument that parental participation was denied when key decisions were made outside IEP meetings. Decisions about extent of staffing, staff training needs, number and content of contracts to deal with low-incidence needs, assistive technology including Augmentative/Assistive Communication, classes, accommodations, modifications, grading, transition trajectory, curricula and extracurricular participation, among other critical IEP team decisions, were decided unilaterally by the District. IEP team decisions were changed outside of IEP meetings, for instance, in spring 2017, when District counsel vetoed the therapeutic day school to which the IEP team had agreed, and when the

special education director decided that since there were complications in installing equipment listed on G.H.'s IEP, it was not needed after all.

e. The IHO concluded that compensatory tutoring services were not warranted despite years of denial of academic instruction based on the theory that a perception that "[t]here is no evidence, however, that the regression was permanent." (Decision, p. 35.) Denials of rights under IDEA do not have to have permanent consequences to have relief, and there is every reason to believe that G.H.'s loss of over two years of appropriate education will have long-term effects.

f. The IHO ignored the unlawfulness of New Trier's conceded practice of making participation by disabled students in extracurricular activities dependent on finding staff volunteers, and ignored and mischaracterized parents' concerns, including their concern that staff were equating being allowed to sit in a wheelchair during a dance, with parents being called if he needed to use the bathroom, with participation. (*Decision,* p. 19.)

g. The IHO ignored the unlawfulness of failing to set forth key information in G.H.'s IEPs, including how progress would be measured via classroom, local and statewide testing.

h. The IHO ignored the unlawfulness of taking away services New Trier had agreed to provide over G.H.'s objection, while due process was pending.

i. The IHO credited the District with progress without regard for whether it had anything to do with district programs. That the vision itinerant saw some "growth in his visual functioning" had nothing to do with school services; she did not attempt to remediate vision, merely providing accommodations. That one writing sample was better than one earlier one does not display progress given the extent of help G.H. requires to physically get words on paper, and if he did progress, it was not likely through efforts at school, where he

was not writing.

j.   The IHO treated progress reports as sufficiently informative even though they provided no information about how much if anything G.H. was learning and sometimes did not even apply to the courses he was taking.

k.   The IHO gave lip service to IDEA;s goal of progress in general education, but did not indicate whether she thought he was a student to whom that was applicable, even though whether he was was a key point of disagreement between the family and District.

l.   The IHO virtually ignored the arguments in parents' closing and reply briefs, ignoring specific requirements of IDEA while crediting conclusory allegations of progress and "participation." Despite limitations on presentation of their case, plaintiffs put on sufficient evidence that they should have prevailed on these arguments:

I.   Procedural violations denied FAPE and warrant remedies.
   a.   The District failed to conduct necessary assessments
   b.   New Trier failed to draft an IEP with an offer of FAPE before ESY 2015, 2016 or 2017, or any school year, instead predetermining his program
   c.   Each year, the District changed G.H.'s program unilaterally throughout the year, often leaving D.H. to try to figure out what was happening by asking questions over and over, which were sometimes answered.
   d.   GH's IEPs have not made clear how, if at all, accountability standards will be handled
   e.   Progress reports were sporadic, misleading, and disjointed from IEPs; they and grades have failed to provide critical information for staff and family.
   f.   Required LRE analyses and recommendations have been AWOL.
   g.   NT has disregarded transition planning, repeating Glencoe's preliminary concepts while leaving G.H. further and further from attaining his goals.
   h.   Staff have attempted to shift to D.H. responsibilities which the law does not impose and which she cannot fulfill.
II.   G.H.'s program was substantively inadequate; remedies

should consist of services that G.H. needed but did not receive, which will foster the progress he should have made in high school.

    a. G.H.'s transportation needs were not met, leading to loss of instructional time.

    b. Staff were not timely or sufficiently trained or supervised.

    c. Staff ill-equipped to elicit skills rushed to the false conclusion that G.H. did not have them

    d. District failures to foster expressive communication have resulted in regression

1. *New Trier has not fostered mastery of the switch system it purports to prioritize.*

    a. Though the point of the switch system was to remove the need for partner assistance, staff have not tracked independent, accurate switch use.

    b. Staff have ignored basic principles of applied behavior analysis in trying to teach switch use.

    c. Home access to switches has been stalled and interrupted by demands that D.H. sign factually false documents with sweeping IDEA releases.

2. *NT has never proposed or offered an extended trial of eye gaze technology.*

    a. NT abruptly and unjustifiably changed and then dropped the floor keyboard—GH's only way to generate thoughts and only mastered means of communication.

    b. NT failed to develop GH's use of the ABC flip pad, a way of writing which is less physically taxing, though still laborious and assistance-dependent

    c. New Trier did not maintain G.H.'s yes/no/I don't know direct select ability.

    d. Vocalizations have been mishandled, predictably causing regression.

    e. Co-creating recorded messages has morphed in NT into button-pushing.

3. NT has mishandled academic programming in every subject since fall 2015

    a. *Staff have over-focused on assessment relative to instruction.*

    b. *During 9G (2015-16), the District:*

        i. Mishandled ELA instruction

            1. by hiring a teacher with limited, life skills class, experience, who resisted guidance and quickly concluded that any

problems were the result of GH's intrinsic limitations rather than her teaching.

    2. by allowing GH's main teacher to disparage him in his presence, likely contributing to disengagement and sadness.

  ii. NTHSD cut back writing instruction.

  iii. Mishandled math by dropping GH's favorite and strongest subject

 c. *During 10G (2016-17), the District:*

  i. Delayed ELA instruction until spring (2/1 @ 1059 l. 20 – 1060 l. 13), and then did it minimally and without access to any mastered form of communication

  ii. Mishandled math by not doing it, beyond temporary, incidental exposures in Che's classroom, all year long

4. NT has failed to meet G.H.'s daily living skill needs

 a. *What is "functional" for G.H. is far removed from a typical "functional" curriculum.*

 b. *Academic skills are "life skills" for almost everyone, and especially for G.H.*

 c. *G.H. needs to learn to control Electronically Assisted Daily Living devices.*

 d. *NT has failed to support progress in toileting, and G.H. has regressed*

 e. *D.H. secured a loaner power wheelchair and has tried to make it work, while NT wasted time with disorganized "practice" dominated by hand-over-hand prompting.*

III.   NT's retrograde position on inclusion is indefensible in 2018, and has been for quite a long time; G.H.'s parents' position has been nuanced and reasonable.

 a. That G.H. needs to learn "life skills" does not mean he needs to be in a "life skills class."

 b. NT mishandled advisory, denying G.H. meaningful interactions with a stable cohort.

 c. NT made lunch an isolated, nonsocial, segregated time for G.H. unjustifiably and without IEP team agreement

 d. NT confused two issues: whether G.H. could learn mainly in a typical-sized classroom, without pull-out instruction, and whether he should receive grade-level content

 e. Crucial positioning accommodations have been handled

> outside of IEP meetings, information has often been
> withheld from G
>
> IV. NT has failed adequately to ensure healthy, safe conditions
> for G.H. at school or to provide home teaching when it
> could not.
>   a. NT has undermined G.H.'s social and emotional well-
>   being
>   b. NT has failed to support mobility and upright postures
>   that require effort from G.H., undermining his health
>   and skills that depend on posture and breathing.

167. Rather than grappling with parents' numerous and detailed arguments—many of which New Trier ignored in its reply brief—the IHO simply decided that this case did not require detailed examination of specific legal requirements.

168. The IHO committed multiple factual errors in rejecting the family's claims. In some cases, the IHO relied on conclusory statements by District and North Shore Consortium for Special Education witnesses, ignoring concessions during cross-examination. In some cases, she got flatly wrong what witnesses and documents had said. In some, she cited evidence so selectively as to generate a misleading conclusion.

169. To a great extent, the IHO simply ignored testimony and documents which did not support her decision to rule overwhelmingly in the District's failure. Though the IHO ordered an Independent Educational Evaluation and accepted the District-proposed provider to conduct that examination, she virtually ignored the report of that assessor, Dr. Rachel Loftin, and her testimony at hearing. The IHO virtually ignored testimony from people who were not employed by the school district or the special education consortium to which it belongs. Among other topics covered at length and ignored by the IHO were:

a. The importance for G.H. of having multiple modes of communication, as each form of physical output is difficult for him and reliable.

45

b.   The importance for G.H.'s communication development of having "something to say"--addressing communication competency in the context of academic and other subjects in which he is interested rather than in hours of switch practice, which has been minimally effective.

c.   The complexity of G.H.'s communication needs, which requires coordination among the family, school district providers, and private providers, and cannot be met by simply giving the District carte blanche over services at school.

d.   The importance for G.H.'s transition of academic skills.

e.   The irrelevance for G.H.'s transition of many "daily living skills" because he lacks the physical capacity to perform them.

f.   The importance for G.H.'s social and emotional well-being of being allowed choice with respect to his education of the type typically available to high school students.

g.   The feasibility of teaching nondisabled, but likely not significantly disabled, peers to use G.H.'s communication systems.

170.  Factual errors, including selective use of evidence to create a false impression as well as outright misstatements of testimony and documents, include the following:

a.   The IHO recited the earlier part of an Independent Educational Evaluation funded by G.H.'s elementary school district—showing early childhood developmental levels—but ignored the fact that by the last part of the assessment--after receiving appropriate services--he was able to do parts of standardized IQ testing, in which he scored at a far higher level. (*Decision,* pp. 13-14.)

b.   The IHO found that "the IEP team, including the mother, agreed to retain [Nicholson] as the AT consultant," indicating that she "had worked with the student before, and the

mother agreed to the district's proposal." In fact, the team offered, and the mother allowed, a joint assessment by Jill Senner, a speech-language pathologist who had worked well with G.H., and Nicholson, who had worked with him unsuccessfully. They were both District AT consultants during freshman year, with mutual agreement, and the District discontinued Senner unilaterally thereafter.

c. The IHO found that "High school staff who were assigned to begin with the student in the fall came in during ESY to become acquainted with the student and to observe how the tutors worked with him." Testimony made clear that while that was the stated purpose of having services provided on the high school site, this did not materialize.

d. The IHO thought that dropping cooking class was discussed in January 2016; in fact, it was agreed to in early fall 2015 since it was immediately clear that the District had made no arrangements for technology or communication systems that would allow G.H. to participate in this mainstream class.

e. The hearing officer failed to mention undisputed testimony that DCFS recommended keeping G.H. out of school until their investigation concluded, blaming the parent for interrupting education and progress of which there was no evidence.

f. The hearing officer thought that following G.H.'s injury in February 2016, there was "no evidence" that "the system" ostensibly designed for communication training was being used as a "restraint." In fact, there was evidence that it was used to restrain G.H.'s hand, so that he could not put in his mouth, and on the theory that restraining movement kept him calm. D.H. was not imagining this use of the "system;" staff discussed it in emails.

g. The IHO left out a key finding of Dr. Rachel Loftin's independent evaluation—that the floor keyboard was currently G.H.s only method of communicating, and that it should be

used intermittently to ensure that he was mastering material. The IHO noted Loftin's concerns about the floor keyboard—which were shared by the parents and private providers—ignoring her conclusion both in her written report and in testimony at hearing that for the time being, it needed to be used, while alternative forms of communication were developed.

h.   The IHO noted what G.H. was doing in math during junior year but only obliquely referenced his teacher's view that instruction was not at the right level and that it was unclear whether G.H. was answering questions with a rate of accuracy exceeding what would be expected to occur by chance.

i.   The IHO found that G.H.'s "school work had improved" by fall 2017 based on comparing two work samples even though neither was done in school, both were done with assistance by G.H.'s mother and/or tutor, and while one was better, there was not basis for inferring improvement.in G.H.'s skills. It appeared from testimony and documents that the District did not get G.H. to write *at all*, much less provided services that resulted in progress in this area.

j.   The IHO found that G.H. was not eating lunch with peers because of distractions and messiness, even though there was evidence that this opportunity had simply fallen through the cracks, leaving him alone with an aide who barely interacted.

k.   The IHO ignored DCFS's role in keeping G.H. out of school pending investigation, and blamed the parent for "disrupt[ing] his progress and education" because she did not "want" him in school.

l.   The IHO ignored most of behaviorist Andrea Gordon's testimony, focusing on her concession that time out of school might have contributed to regression while ignoring the

factors at school which she saw as definitely having done so.

m.  The IHO described the family's request for homebound services following the injury and indicates that the District responded in six days; in fact, services had been requested over a month before, at the time of the injury.

n.  The IHO, without explanation, found that New Trier offered "comparable" services to what had been provided in the previous district even though 1:1 teacher involvement was reduced from full-time to three hours per day.

171.  Conduct of the hearing denied due process in multiple respects:

a.  The IHO limited the length of hearing to seven and a half days, a few of which started late or ended early, and one of which was punctuated by lengthy District-requested time to review previously submitted documents, despite the fact that this matter involved three consolidated hearing requests, an extraordinarily complex set of disabilities and low-incidence, unfamiliar, complicated methodologies, and despite objections before and during hearing that more time was required to present student's case.

b.  The IHO created confusion before, during and after hearing as to what evidence would be admitted.

c.  Rather than admitting evidence proffered by the parties—as both sides stipulated could happen—the IHO gave shifting instructions as to what was required in order for evidence to be made part of the record.

d.  Following hearing, the IHO tasked the parties' counsel—one lawyer representing the family, and three representing the District, with trying to figure out which exhibits she considered admitted and getting those documents to her, in contrast to the typical process in which hearing officers track exhibits during the course of hearing, let parties know during the

course of hearing what documents have been and which remain to be admitted, and take admitted exhibits at the end of hearing, leaving parties to focus on closing arguments.

e. The IHO selectively cited evidence which supported New Trier's position while ignoring evidence that supported the family's position. The IHO paid very little attention to expert testimony on parents' behalf and cited it in selective, at times misleading ways, when she referred to it at all.

f. The IHO did not make explicit credibility determinations though the case required them. Often, she simply ignored relevant evidence. For instance, the special education consortium's vision itinerant testified at hearing that she had grave doubts about whether G.H.'s output through the floor keyboard was really his own. She acknowledged not having shared these concerns with the mother or IEP team, but claimed that she and G.H.'s teacher had shared an account of math testing possibly involving suggestion with a physical therapist who denied having heard this from the Safe Haven teacher. The vision itinerant's contemporaneous documentation during junior high that she had personally observed G.H. read print, walk to answers on a floor, and spell works by walking to letters did not support her claim at hearing that she had long seen teacher-reported skills as illusory. Similarly, on issues involving the credibility of D.H. and New Trier staff, the IHO did not resolve credibility issues, but ignored them.

g. The IHO ignored each side's main arguments and issued an order that provided no clarity with respect to G.H.'s education going forward. G.H.'s parents asserted that he needed access to general education content, and that the constant focus on testing—which is extremely time-consuming and unreliable given his motor limitations and the banning of the one-person floor keyboard at school--was interfering with instruction. The IHO ignored that

allegation. G.H.'s parents asserted that he has communicative abilities which skilled individuals can use, but that the school district is failing and often refusing to use and enhance those abilities. The IHO nearly ignored that allegation, focusing on the floor keyboard, but not on the alternatives that needed to be developed. G.H.'s parents criticized the District's dichotomy between "functionality" and "academics," noting how functional academic skills are for G.H. (for instance, spelling is his only way to spontaneously communicate), pointing out how far beyond his capacity many daily living skills are and will remain, and calling for targeting of self-help skills that he actually can learn with adequate goals and instruction. The IHO ignored these concerns. Meanwhile, the District sought a finding that G.H.'s mother had frustrated the IEP process, and did not get such a finding, as well as permission to shift to a "life skills" classroom, which it also did not receive. The IHO failed to rule on many issues raised by the Parents in their hearing requests or engage in the legal analysis of each program and placement provided to G.H. by the District as required by *Rowley* and *Endrew*.

172.  The IHO's order failed to resolve numerous conflicts between the parties:

  a.  The IHO ordered the continuation of English, reading and math without specifying a level of instruction or how mastery should be determined.

  b.  The IHO neither granted nor denied New Trier's request to spend more of G.H.'s day on 2-step switch practice and on power wheelchair use.

  c.  The IHO ordered that G.H. be allocated time to work on communication but did not define what that meant vis a vis what was previously implemented and what each party recommended.

  d.  Despite, multiple programs and placements along with varied goal implementation

during the 2015-16, 2016-17 and 2017-18 school years, the IHO made no comments on which IEP, program, placement or goals were and were not appropriate for G.H. but simply stated that the District provided a FAPE to him.

173. Crucial parts of the order were out of the blue and unexplained:

a. There was no explanation for the IHO's Order reducing 1:1 teacher services to half the level the District had requested and drastically cutting aide services though the District had not requested any change. District witnesses did not support either of these changes and only the special education director seemed to know that the District was asking to reduce teacher time. Notably, the District did not follow the IHO's Order on these points in drafting an IEP for G.H. following the April 7, 2018 order.

b. There was no explanation for the IHO's Order to reduce vision itinerant minutes or shift related services minutes to block amounts, as opposed to weekly visits, and eliminate training and consult minutes which are in the IEPs previously drafted by the District.

174. In sum, the IHO gave New Trier free rein to change G.H.'s program in ways which were not supported by any evidence or testimony and which were more extreme than requested by the District's lawyers. The IHO authorized cutting existing 1:1 special teacher services, which were being provided in all academic classes, even more drastically than New Trier had requested (to 40 rather than 80 minutes per day)—though there was no testimony in support of *any* reduction in teacher time and no staff other than the special education director were aware such a reduction was even being contemplated. It appears that the IHO misunderstood the District's request. The order required an "individual aide" only during lunch, though the District's proposed order called for the 1:1 para-educator will be fulltime and in all settings, for the entire day. The order did not require any assistive technology consultations, though the District had

asked for an order for bi-weekly consultations. Rather than 40 minutes per day of math with a 1:1 teacher, the IHO allows this to be provided as part of a "morning block" in an unspecified setting with no specified supports. Though the District has interpreted this period as authorizing a "life skills" classroom, the order did not say that, or in any other way endorse the District's view that that was where G.H. belonged.

—COUNT TWO—

Against New Trier High School District and its Board of Education

*Violations of § 504 of the Rehabilitation Act*

*29 U.S.C. § 794 – Disability-Based Discrimination*

*(Demand for Jury Trial as to Liability and Damages)*

175.  Plaintiffs repeat and reallege Paragraphs 1 to 174 and incorporate them herein by reference.

176.  G.H. is a person with known and ongoing physical, vision and language impairments that substantially limit nearly all of his major life activities. As a result G.H. meets the definition of a person with disability under § 504 of the Rehabilitation Act.

177.  New Trier is a covered entity under § 504 by virtue of its receipt of federal funds.

178.  In violation of § 504, G.H.'s educational needs were not met by New Trier as adequately as the educational needs of nondisabled students. New Trier is an outstanding school district which fosters both the academic and social-emotional wellbeing of its students, but it has failed to provide meaningful instruction for G.H. in academics or in daily living skills, has mishandled communication access and needs, and has engaged in discriminatory and exclusionary practices which have left G.H. demoralized and unhappy.

179.  In violation of § 504, school policies regarding class attendance, class selection and

grading were not applied to G.H. nor were they ever discussed as an IEP team; at hearing, staff revealed that grading had been based on "effort," not mastery.

180. Non-disabled students at New Trier are provided access to supports when they are struggling rather than hastily deemed incapable and removed from classes and entire fields of study, as happened to G.H.

181. New Trier failed to develop, finalize and/or implement an IEP that included the necessary services and supports to enable G.H. to access his education and participate in the general education curriculum at his ability level with his non-disabled peers. It suspended math instruction for two years, creating a gap between G.H. and peers which did not previously exist.

182. In violation of section 504, G.H.'s educational needs as a result of his motor, vision and language disabilities were not being appropriately met by New Trier.

183. High-tech and low-tech devices and sensory and positioning equipment that would have greatly improved G.H.'s ability to access instruction were not provided,

184. New Trier has admitted that it is not meeting G.H.'s needs internally but has failed and refused to make changes necessary to let it do so or to allow re-creation of the kind of program during which G.H. was successful during junior high.

185. New Trier denied G.H. access to extracurricular activities unless staff volunteered to accompany him, which resulted in him missing preferred activities.

186. New Trier denied G.H. meaningful access to extracurricular activities, failing to take steps needed for him to communicate with peers, and vice versa, and failing to realize that he actually wanted to participate in activities rather than spectate.

187. New Trier imposed burdens on G.H.'s parents which are not imposed on students of nondisabled students by indicating that if he needed to use the restroom during a school dance,

they would be responsible for coming to assist him.

188.  New Trier prides itself on an "advisory" system in which a cohort of same-sex peers stays together throughout high school, including during the transition from the freshman campus to the grades 10 – 12 campus. G.H. was initially excluded from advisory activities because of concerns about how other students would respond to his presence. Despite promises that peers were being trained to communicate with him through use of his PODD book, this did not happen. G.H. was a spectator in advisory class, and found hearing about activities that he was not being supported to participate in – such as academic evaluations – demoralizing.

189.  New Trier provided G.H. and many other students with disabilities students with a shortened instructional day, fewer days of instruction as compared to general education peers, no access to before and after school academic supports or early bird classes available to general education peers, and automatic relegation to life skills track because of physical and communication impairments.

190.  G.H.'s has been awarded credits for activities that have nothing to do with classes offered by New Trier and in some cases featured little or no teacher involvement, and the plan is to issue him a diploma without allowing him to take any significant number of academic classes or chosen electives.

191.  On information and belief, New Trier and Ambuehl knew or should have known that their actions would violate G.H.'s rights and cause his education and emotional health to be injured. At best they manifested deliberate indifference; often, they were specifically informed that G.H. was sad because of how he was being treated at school. The District by its actions and inactions set forth above, has violated and continues to violate Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 (Section 504), and the regulations promulgated

thereunder, 34 C.F.R. Part 104, by denying a free appropriate public education pursuant to Section 504 and its implementing regulations as well as discriminating against Plaintiffs on the basis of G.H.'s disabilities.

192.  As a direct and proximate result of the District's violation of Section 504, G.H. faces sharply reduced prospects for success in education, employment and community living, and G.H. and his parents have suffered and continue to suffer injuries, pain, anxiety, mental anguish, emotional distress, lost earnings, out-of-pocket costs, and damage to reputation, social and educational development and personal relations, in an amount to be ascertained according to proof at trial. Staff acted in some cases knowingly, and in other instances with reckless disregard for the impact of their acts and omissions.

—COUNT THREE—

*Violations of Section 504 of the Rehabilitation Act*

*29 U.S.C. § 794 – Retaliation for Disability-Related Advocacy*

*(Demand for Jury Trial as to Liability and Damages)*

193.  Plaintiffs repeat and reallege Paragraphs 1 to 192 and incorporate them herein by reference.

194.  G.H. is a person with known and ongoing physical, vision and language impairments that substantially limit nearly all of his major life activities. As a result, G.H. meets the definition of a person with disability under Section 504 of the Rehabilitation Act.

195.  G.H.'s mother, D.H., has advocated on his behalf since he entered the District.

196.  New Trier is a covered entity under Sec. 504 by virtue of its receipt of federal funds.

197.  The District has retaliated against G.H. and his family in the following respects:

a.   The District has cut off normal, vital communication between parents and school staff by channeling communication through administrators and lawyers. Ellie Ambuehl initially took charge of communications that would normally be done between parents and educators. Then, the District hired a retired administrator to serve as a go-between for communications. Neither administrator consistently shared information, followed up on open inquiries, or understood G.H.'s disability or program. Both were openly hostile to D.H., modelling defensive, unprofessional behavior to line staff. Their involvement has complicated communication and delayed necessary steps on G.H.'s behalf. So has excessive involvement by District counsel, on whom administrators have relied for program development rather than consulting people who have worked successfully with G.H. in the past or directing staff assigned to work with him now to cooperate with his family and private providers. Meetings to discuss G.H.'s AAC have been cancelled and postponed because of legal developments, causing long delays in getting technology into his home which all parties agree he urgently needs to access across all environments.

b.   The District filed a meritless case in May 2017 seeking to put G.H. in a therapeutic or residential placement on the grounds that his mother's advocacy created a relationship that warranted freeing staff of the obligation to work with her to educate her son. The District accused D.H. of outrageous behavior. In January 2018, the District withdrew that baseless hearing request, and though at hearing it relied on parental conduct as its main defense for G.H.'s program, it did not even try to demonstrate the truth of many of these allegations.

198.  The District by its actions and inactions set forth above, has violated and continues to violate Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 (Section 504), and the regulations promulgated thereunder, 34 C.F.R. Part 104, by retaliating against G.H.

and his parents because of his parents' litigation and other advocacy on his behalf.

199.  As a direct and proximate result of the District's retaliatory practices that have blocked necessary communications related to his education and slowed service and equipment provision, violating Section 504, G.H. faces sharply reduced prospects for success in education, employment and community living, and G.H. and his parents have suffered and continue to suffer injuries, pain, anxiety, mental anguish, emotional distress, lost earnings, out-of-pocket costs, and damage to reputation, social and educational development and personal relations, in an amount to be ascertained according to proof at trial. Staff acted knowingly in treating G.H. and his mother adversely because of her efforts to advocate on her son's behalf.

—COUNT FOUR—
Against New Trier High School District

*Violation of the Illinois School Student Records Act*

200.  Plaintiffs repeat and reallege Paragraphs 1 to 199 and incorporate them herein by reference as against Defendant New Trier.

201.  The Illinois School Student Records Act ("ISSRA") as delineated at 105 ILCS 10/1 *et. seq.* provides that a student record is "…any writing or other recorded information concerning a student and by which a student may be individually identified, maintained by a school or at its direction or by an employee of a school, regardless of how or where the information is stored".

202.  ISSRA further describes a parent and student's rights to "inspect and copy all school student permanent and temporary records…" and that this right "…must be granted within a reasonable time;" it specifies a maximum amount of time, which has changed while this matter was pending. 105 ILCS 10/5.

203.  ISSRA requires notice to the parent before any student record is destroyed or

information is deleted. 105 ILCS 10/4.

204.  Despite repeated and ongoing requests from G.H. and her counsel, including as recently as July 2018, New Trier has not provided a full and complete copy of G.H.'s student records.

205.  Instead, New Trier argues against production, produces some records belatedly, after the educational planning to which they were relevant is well underway or superseded by events, or fails to produce them at all.

206.  New Trier incorrectly equates production of a lot of records as complete production.

207.  G.H.'s parents have relied on information that should be available under ISSRA because New Trier has not included them as equal participants in planning for G.H.'s educational program and placement and not provided them with timely information to do so. Getting these records let G.H.'s parents see that the program being provided to G.H. diverged greatly from the program it had unilaterally set forth in a series of incomplete, unfinished IEP documents. This ongoing refusal to provide the Parents with access to student records and/or the destruction of them is willful or negligent and in violation of the express requirements of the ISSRA.

208.  The ISSRA authorizes actions for injunctive relief and monetary damages in the "…Circuit Court of the County in which the school is located…" or in which the violation occurred.

209.  This Court has supplemental jurisdiction over this state court claim as it is related and forms part of the same case or controversy. 28 U.S.C. § 1367.

—COUNT FIVE—
Against Ellen Ambuehl

*Individual Liability for Substantive and Procedural Violations of Individuals with Disabilities Education Act with remedies sought pursuant to 42 U.S.C. § 1983*
*(Jury Trial Requested as to § 1983 Claims)*

210. Plaintiffs repeat and reallege Paragraphs 1 to 209 and incorporate them herein by reference.

211. A claim under 42 U.S.C. § 1983 allows a person to seek redress against a government actor, or a person acting under the color of state law, for violations of the constitution, state and/or federal law that result in harm.

212. Illinois law allows claims under public bodies and individuals under § 1983 for IDEA and other violations. The Seventh Circuit has allowed use of § 1983 to address IDEA violations.

213. New Trier receives funding, including, but not limited to, for GH through a combination of federal flow through funds, state and local funds. New Trier continued to represent that G.H. was its student and accept ISBE special education funding for him even as it had no completed IEP and specifically from February 23, 2016 through August 29, 2016 even as he was not attending school or being provided with homebound services.

214. New Trier is liable under 42 USC § 1983 as a public entity for its violations of federal, state and local laws that resulted in harm to G.H.

215. A relationship existed between G.H., his teachers and New Trier. Teachers and administrators have an affirmative duty to protect students from dangerous situations and to assure that they are free from discrimination and receive a free appropriate public education if they are eligible for such services.

216. This includes the duty of administrators to investigate quickly and thoroughly when he/she receives a complaint from a parent that a student is unsafe at school, resulting in injury. Not taking complaints seriously or conducting a minimal investigation constitutes deliberate indifference to the safety of children and creates a dangerous environment.

217. Jill Senner, an Augmentative and Assistive Communication consultant, and Susa

Norwell, a literacy consultant for the District, repeatedly and timely advised Ambuehl that G.H.'s program was not working and needed major changes. Norwell reported to Ambuehl that teacher Heather Wiggins was persistently making negative comments about G.H.'s ability in his presence and that this violated professional practices and ethics and was detrimental.

218.  The Parents repeatedly and timely advised Ambuhel and other district staff of the problems that G.H. was having at New Trier because of the ways in which his disability was being mishandled.

219.  In early fall 2016, G.H.'s new teacher requested a reading program to use with him. Instead, she was fired; according to Ambuehl, this was because of a mismatch between her abilities and G.H.'s needs. This firing may have been retaliatory; G.H. was then assigned an aide who New Trier falsely characterized as a teacher, and months passed before the novice teacher who was eventually hired had materials to work with G.H.

220.  Ambuehl and other district staff ignored both the parents' and professionals' request for help as well as G.H.'s needs resulting from his disability, instead disparaging D.H., withholding information from her and giving her disinformation, and baselessly concluding among themselves that previous educators had misrepresented G.H.'s performance with them.

221.  Ambuehl treated G.H. differently than other students with and without disabilities and did so under color of law, including denying supplementary opportunities, extracurricular opportunities, ordinary teacher communications, ordinary class selection methods, ordinary grading, and more, because of her and

222.  Ambuehl and school staff unilaterally exempted G.H. from school policies regarding class registration, attendance, participation, school work and grading.

223.  Ambuehl and school staff even gave G.H. grades and course credit in classes they did

not have him attend.

224. On information and belief, Ambuehl and other district staff allowed school and cooperative staff to treat G.H. differently than other students in ways that were likely to and did adversely affect his education.

225. Ambuehl and ignored D.H.'s concerns about the treatment of G.H. and in so doing allowed the maltreatment of G.H. by district and cooperative staff to continue.

226. New Trier willfully disregarded G.H.'s safety by failure to provide appropriate training to staff. By this failure, it allowed a problematic situation to develop that otherwise would not have been present.

227. The harm to G.H. from untrained special education teachers was foreseeable.

228. New Trier used its authority to create an opportunity for his injuries to occur that otherwise would not have existed.

229. At IEP and other meetings held district staff did not deny or address D.H.'s allegations and concerns.

230. At no time did the district address the Parent, Senner and Norwell's concerns in an IEP meeting, provide the necessary staff training in G.H.'s needs, undertake full and complete evaluations to determine the extent of his disabilities and related needs, or revise G.H.'s IEP to remedy the continued unilateral programming outside of the IEP and school policies, and/or provide sufficient supports and services to remediate the problems caused by its indifference to his needs and mistreatment because of his disability.

231. At no time, did Ambuehl step in to support G.H. in the face of improper staff training and uncompleted IEPs. Instead she initiated and perpetuated the problem by continuing to unilaterally program for G.H. outside of the IEP process, fail to follow school policies, ignore

and defy state and federal law in regards to him, and talk negatively about D.H. and her concerns to other administrators and line staff perpetuating their mistreatment of G.H. and his mother.

232. These actions individually and combined by New Trier and Ambuehl were taken with deliberate indifference towards G.H.'s status as a student with a disability, in violation of its own policies and clear legal requirements, had no relationship to any legitimate educational or other objective, were in violation of clearly established law and served to cause ongoing and substantial harm to him.

—COUNT SIX—

*Section 1983 Violations of the Equal Protection Clause
as delineated in the Fourteenth Amendment to the U.S. Constitution*

233. Plaintiffs repeat and reallege Paragraphs 1 to 232 and incorporate them herein by reference.

234. The Fourteenth Amendment to the U.S. Constitution requires that states treat individuals the same as others in similar conditions and circumstances.

235. For purposes of the application of the Fourteenth Amendment, New Trier, a state created and funded educational institution, is a state actor.

236. Without any arguable rational basis or legitimate state purpose, Ambuehl and New Trier excluded GH, based on his disability, from important school settings.

237. Staff apparently excluded G.H. from participating in advisory at the beginning of freshman year because of its concern that classmates would be made uncomfortable by him. State actors may not be able to eradicate all private prejudices, but they cannot give force to them by requiring that people with disabilities remain out of sight for the comfort of others.

238. Staff have apparently excluded G.H. participating in lunch from the time of his entry to

the District at least through the time of hearing in late January-early February 2018 because he is "messy," and they believe that would make a bad impression on other students. There was no evidence supporting the District's contention that he was too "distractible" to eat in a large group; the concern seems to have been the comfort of other students and staff.

239. While excluding G.H. from various general education settings, the District has also failed to include him in activities for students with disabilities that he would enjoy and that would provide much-needed social opportunities. It appears that these opportunities were denied because his parents would not consent to have academic instruction delivered in a "life skills" setting. This was an improper rather than legitimate basis for curtailing G.H.'s access to recreational activities for students with disabilities.

240. New Trier administration and school board members were aware of disparate, exclusionary treatment and engaged in or ignored it.

241. This disparate treatment was due solely to GH's disability-related behaviors and resulted in unequal and unfair treatment between him, non-disabled and other disabled students.

## CONCLUSION

242. From his entry into New Trier through the hearing in this matter, G.H.'s IEP team never completed an Individualized Education Program. The District resisted duplicating his previous, successful program, and D.H. and R.H. could not convince the first assigned hearing officer to force it to do so. G.H.'s education was left in a limbo in which New Trier made plans and changed plans unilaterally, and failed to report progress or lack thereof on the goals it purported to adopt.

243. Not only was denial of information and participation in decisionmaking improper, violating IDEA's procedural requirements for parent involvement in development and

monitoring of Individualized Education Programs, but what New Trier did with that power was disastrous. G.H. stopped writing at school, did virtually no math for two years, and staff could not tell how much he was understanding text and oral presentations. Previous forms of communication deteriorated, while the District's plan for a two-step switch system foundered, partly for logistical reasons, partly because of problems in teaching G.H. how to use it, and because of District failures and refusals to make technology available to G.H. at home, despite everyone's agreement that he needed it there.

244. At New Trier did not claim that G.H.'s education had been successful, but rather that his mother was to blame for its failures. The District sought permission to transform his program completely. Staff did not explain what they thought would be "functional" for G.H., though they made clear that what they had been doing so far, at least in the way they were doing it, was not.

245. New Trier did not argue that he was now—after two years of practice—using, or near using, switches for communication, but claimed that still more of his school time needed to be allocated away from instruction to switch practice. Staff claimed to have wanted an eye gaze technology trial and blamed D.H. for it not having happened, but it was not until after hearing that the District and its consultant proposed the first steps of a trial—seeing whether a system could be calibrated to recognize G.H.'s atypical, fleeting, indirect gaze.

246. The IHO rendered an incoherent decision. Ignoring most of both sides' arguments and most of the evidence presented by witnesses for both sides, she issued an order for a program that District witnesses, and even lawyers, did not advocate. The IHO's decision left the parties with no alternative but to work around the order—however, they are doing so on an extremely unfair playing field, in which the District's failures have been largely dismissed and, where acknowledged, barely and irrelevantly remedied.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

Remedy New Trier's violations of the Individuals With Disabilities Education Act by:

1. Ordering the District to provide stay put commensurate with the March 2014 Safe Haven School IEP or alternatively that it fully, as opposed to selectively, implement the December 2015 draft IEP that the District claims it is implementing as stay put.

2. Receiving and reviewing the record of the administrative proceedings from the Illinois State Board of Education;

3. Admitting and considering the Parents' 4/24/18 and 4/29/18 proffer of D.H.'s testimony and corresponding hearing exhibits;

4. Receiving additional evidence as requested by plaintiffs fer and other evidence as requested by them as the Court deems appropriate;

5. Reversing the IHO's Final Determination and Order denying relief as to most claims.

6. Modifying the IHO's Final Determination and Order giving participation in an extra curricular activity as compensatory services for a failure to provide G.H. with instruction by certified staff during the 2016-17 school by ordering relevant, sufficient compensatory education in the form of academic tutoring, transition support, and communication development opportunities.

7. Determining that New Trier has violated the rights of plaintiffs under the Individuals with Disabilities Education Improvement Act of 2004 and awarding reimbursement to the extent that parents were able to provide services at their own expense; ordering compensatory education to the extent required to compensate for both the denial of "stay put" as well as services which G.H. did not but should have received, including

at least two years of compensatory academic/communication/ transitional/vocational support and counseling to GH with providers acceptable to his parents; and ordering prospective placement and services which G.H. requires.

8. Awarding attorneys' fees and costs for hearing-related work and attending IHO-ordered IEP meetings in light of plaintiffs' prevailing party status with respect to failure to provide trained staff during the first four months of G.H.'s sophomore year.

9. Awarding attorneys' fees and costs in the event that plaintiffs prevail with respect to additional IDEIA claims.

Remedy New Trier's disability discrimination and retaliation in violation of § 504 of the Rehabilitation Act of 1973 by:

1. Determining that New Trier has violated the rights of plaintiffs under Section 504 of the Rehabilitation Act of 1973 and award monetary damages according to proof, at a jury trial, for emotional trauma and pain and suffering inflicted on G.H. and his parents; as well as injunctive relief to prevent future denials of equal educational opportunity.

2. Awarding attorneys' fees and costs in the event that plaintiffs prevail with respect to Section 504 claims.

Remedy violations of the Illinois Student Records Act by:

1. Ordering New Trier to produce a full and complete copy of G.H.'s student records, except those included in the parties' submissions at hearing;

2. Awarding Monetary Damages, attorneys' fees and costs for the willful or negligent violation of this statute in amounts to be proven at trial.

Grant relief under 42 U.S.C. § 1983 by:

1. Ordering Ellen Ambuehl to compensate G.H. and his parents monetarily for

opportunities lost, time spent, emotional distress experienced, and expenses incurred in connection with her violations of IDEA's procedural and substantive provisions.

2. Order Ellen Ambuehl to compensate G.H. and his parents monetarily for opportunities lost, time spent, emotional distress experienced, and expenses incurred in connection with her involvement in exclusionary treatment of G.H. and discriminatory treatment towards G.H. and his parents.

Award such other relief as the Court may deem appropriate.


Date:  August 6, 2018

Respectfully submitted,                              /s/ Maureen R. Graves
                                                     Maureen R. Graves
                                                     Counsel for Plaintiffs G.H., D.H., and R.H.